All right, we're ready to take up the United States v. Hale, and Mr. Miller, whenever you're ready. Thank you very much. If the Court please, I'm Marvin Miller for Mr. Hale. This is basically a plain error case, and there was a lot of plain error that affected his substantial rights. The prosecution put- But everything up here is on plain error, isn't it? Except for giving the willful blindness instructions to which he specifically objected. But everything else is up here on plain error. That's correct, Your Honor. That's right, Judge Wilkerson. So the issue was knowledge of whether goods were stolen or not, and they put in evidence about the boosters who were doing stealing that he didn't know and he never met, according to the prosecution witnesses, about their drug problems, which led to a closing argument that said convicting because he's supplying the money for the drug dealers in Gaston County. Then the Court gave a willful blindness instruction not supported by the evidence, misstated the law when it gave it, later gave it correct, but in the beginning gave it incorrectly, then told the jury about slight connection to the conspiracy, but failed to tell the jury that, as this Court said in Burgos, that has to be proved by a heavy quantum of evidence. The test is slight, but the evidence to prove it is beyond a reasonable doubt, and then singled him out after having given an interested witness instruction and said, now, about the defendant, he is an interested witness, and gave an instruction that was in violation of Hicks because it made the implication of his testimony was improbable. Did you object to the willful blindness? I didn't try the case, Your Honor. I came in after conviction. So the willful blindness instruction itself was objected. I think that's 1244. The judge stated what instruction he was going to give at 1244, and then at 1733 gave a different instruction than he said he was going to give. So he said, I object. I'm going to give it anyway. Your objection is preserved. And if you have to give one, that one's okay, because he said what he was going to give. And then when he got to 1733, he gave a different instruction. Later on, he did give a correct one, but when he gave the correct one, he didn't say, this is correct, that's wrong. So the jury was like in the Walker case from this Court, was it 93 or something like that, where you give it right and you give it wrong and you don't know which one the jury did. Under those circumstances, you're not in a position to say that the jury followed the correct law. What was wrong about the first one? If you could help us there. In the first one, he said to the jury, find an inference that he had a strong belief and a high probability that the other fact, which is that goods were stolen, but took an action to avoid knowing facts that would point to facts. You're saying it was a double, the piling on of inferences. The piling on of inferences. And then in the bottom part, it's like get to a chain of circumstantial evidence. And in the first place, it said, find an inference. And if you look at Gen Wright and you look at Global Tech, and Global Tech Justice Alito's writing for all but one, eight to one decision, Judge Kennedy dissented. But Judge Wilkinson said that you almost have to, a defendant in a willful blindness instruction, who can be said to almost actually know, not to infer that they knew, but they have to actually know, and they have to actually know the fact, one, and it's got to be the fact, not facts pointing to facts pointing to facts. It's got to be actually know the fact and then take an action. And in this case, there was no action. I'm sorry, Judge Wilkinson. Excuse me. What we said was that he had to be subjectively aware of a very high probability that the goods were stolen. That's correct. And that he avoided learning of the fact. Now, there seem to be a lot of reasons why this defendant is going way out of his way to avoid, you know, either to maintain deniability or to avoid learning about the fact. And then these goods are coming in. They have these branding stickers, and they're coming into his warehouse in garbage bags and plastic bins and whatever. And all those branding stickers have to be removed for the goods to be resold. And then he gives Brock, who I guess is one of the first-level fencer or whatever, he actually gives him a recording device and tells Brock to record Brock's supplier saying that they didn't sell stolen goods. There's some facts that are a little bit inaccurate in that, Judge Wilkinson, if I may. According to the prosecution, Bridges had only 20 percent with stickers on it. And he had contractors who had contracts with Kroger's, Costco, Reclamation Centers. And he had his major sources were High Point and Jerry, according to the prosecution witness, Cook. And their goods weren't shown to be any different than what Bridges brought in and her people brought in. So there wasn't any, and there was no expert testimony. Nobody said, well, if you look at Bridges' stuff, see how different it is from what everybody agrees is legitimate material. The second thing is that they went. Well, Brock's testimony that the goods that he, that it was obvious to Hale that the goods that he was purchasing were from boosters and that that should have put Hale on high alert that the boosters were addicts who had to get the next fix and that they were going to steal, they were under, you know, they were so eager to get the next fix that they were willing to steal goods and sell them for a very marginal profit. There's no way that he would know that somebody he steals is a drug addict. There's just no way. And the government's evidence was that he didn't know about the boosters. They said, Brock, did he know about them? And Brock didn't say no. He said, I can't say that he did. He knew about Bridges, but he didn't know about the others. There was no question that he didn't know about the boosters because when they asked the government witnesses to say that he did, they wouldn't say it. And so there's. And who is the person to whom Hale sold the property in Florida? Tressler. He sold it to Tessler. He sold it to Delavecchio. Delavecchio sold it to Kroger's. And Tessler said he knew it was stolen goods. Well, Tessler. Bridges knew it was stolen goods. And Cook sort of talks around it. There's a conversation imputed to Cook where she had to know it was stolen goods. She's working there for eight years, and daily these bags are coming in. And then the IRS comes around, and they have these conversations about you don't know who we're selling to. You don't know. Don't turn on me. I mean, I have a list here of about 15 incidents which suggest that he knew. He knew that he's in an operation, and he's covering it as well as he can. Even if he did, which I don't think he did, as they said he didn't, he's still entitled to a valid instruction. And he didn't get one. And because he didn't get one. Did you ever object to the instruction? The instruction that was told at 1244 was correct. The one that was given during the trial was not. There was no objection to it. Ms. Miller, though, I don't think that a prior counsel objected to the content of any willful blindness instruction, but merely said that the evidence is insufficient to warrant giving any willful blindness. That's correct, Your Honor. So it's a plain error issue, and the instruction is real clear as to, the law is real clear as to what it has to contain, and it didn't contain that. In addition to which, the- Well, it did contain what I think is a crucial safeguard, which the Court says, I thought, in the instruction, that negligence is absolutely not enough to prove willful blindness. But negligence is not, negligence is part of it, but the point is that the defendant, according to Justice Alito, has to be shown to virtually know, and the jury wasn't told that. They were told they could infer, they were told they could look at evidence in a link in a chain of circumstances, and that's not the law. Going back to my colleague's question, the objection was raised to whether the willful blindness instruction- There was no objection to the content. Was going to be given at all. But the objection, as I understand it, was not raised as to the content of the particular instruction. That's correct, and then the last piece, and then I'm going to say the rest of the rebuttal, if that's acceptable to the Court, is that the heat of passion raised by the closing argument where 14 times in 6 pages they talk about Hale supplying drug dealers with the money to run the drug trade in Gaston County. Exactly true. The scope and description of this conspiracy was explicitly testified to by Bridges. She talked about the boosters. She talked about where they got it, how they functioned. But that's not admissible. That's not part of the conspiracy. It's not part of the conspiracy, because whether or not they used the money for drugs in Moonshine doesn't prove that they steal or don't steal and doesn't prove what he knows. The scope of the conspiracy is a booster steals the drugs, gives it to Bridges, Bridget gives it to Hale, Hale sells it to Tesla. That's the scope. Now, the argument you're making is that Hale didn't know about his participation in the conspiracy, but the conspiracy itself objectively clearly included the notion that where the money came from, where the goods came from. The goods didn't look any different from what everybody agrees are legitimate goods, so how is he going to be on notice? We're not talking about knowledge now. We're talking about whether that evidence is legit to be argued. Well, it's not accessible. Just a minute. I'm sorry. You'll hear me out. Yes, Your Honor. The conspiracy, the nature of the conspiracy is uncontested that it was a conspiracy that began with stealing goods from legitimate places, selling them to Bridges as a fence, selling them to Hale as a fence, and selling them to Tesla. Now, Hale says I'm innocent. That's an okay argument, but that does not go to the scope of the conspiracy which the government can argue. And, of course, they argue that he did know. I'll say for rebuttal, he was entitled to valid instructions, telling the jury the law, and he didn't get them. That's a different issue. Well, that means he didn't get a fair trial. May it please the Court. There was ample evidence that the jury could reasonably infer that Mr. Hale was deliberately ignorant. In other words, he knew of facts that would have told him that the goods were stolen, and he was deliberately ignorant toward those facts. In terms of the instruction, the district court gave an instruction that adequately stated the controlling law. This court does not require precision on specific words. And what the district court advised the parties that it would give was the gin-right instruction, which said it required that the jury find beyond a reasonable doubt that the defendant was aware of facts that would establish that the goods were stolen and was deliberately indifferent to those facts, deliberately did not want to know them. And there was nothing. The indifferentness was conveyed. Absolutely. The willfulness was conveyed in the instruction. And what about Mr. Miller's distinction, though, that he's drawing between the first instruction and the second one? Well, those were all given at essentially the same time. And I don't – I guess my issue or my concern is I don't think at any point the district court gave an erroneous instruction. So just to say – So how did the two differ, then, from your perspective? Not meaningfully at all. The only difference I think what he is pointing to is that in one of the instructions and I want to – You're saying that there was a – permitted the jury to find – to draw inferences from inferences. Except what he really – and I'll just – let me find the language. Because what he says is that the jury had to be – Do you have an appendix? I do, yes. I'm sorry. Pages 1733 to 1734. And the district court says that the jury must find that the defendant was subjectively aware of the high probability that the goods were stolen, but purposely – and here's the language that I think that Hale's counsel is pointing to – purposely avoided learning facts pointing to the fact that he was buying stolen goods. Facts. Well, right. But I mean at the – what that says is he knew facts that established that the goods were stolen and then deliberately chose or worked to make sure that he did not appear to know those facts. I don't think there was anything wrong with that instruction. I don't think the instruction, whether it was the first or the second, was not objected to. No. It was purely – you don't have enough basis in the evidence to give a willful blindness instruction in the first place. And as Judge Niemeyer points out, you know, there are about a dozen things that would tip a person of any – would tip any reasonable person off to the fact. Right. At least. Now, so there's two ways that this court could affirm the willful blindness instruction. One is the government believes and it's established that the defendant actually consented to the content of the Genride instruction. It's the government's position that the instruction that was given was the Genride instruction and that there's no meaningful difference between the words that Judge Cogburn used in this case and the words that I think it was Judge Conrad used in the Genride case. But even if the court were not to find waiver, then we address plain error. And, you know, even without the plain error part of it, this court would have to hold that the instruction did not adequately state the controlling law. Where's the error? There is no error. That's the government's point, is there is no error at all because it adequately states controlling law. But even if – Well, I think his argument is on the first one that he argues and he takes a clause out to suggest that you can infer the knowledge of Hale. But he leaves out the preceding clause that says you have to have a probability that he knew. Right. A high probability that he knew. Right. And then that evidence. Exactly. I mean, I think if the court reads both instructions, I hesitate to say it's two instructions. It's a single instruction. There are a couple of different – there's one phrase, I suppose, that's in the second part of that. But he always consistently says you have to find it beyond a reasonable doubt and it is not enough that Hale should have known. You have to show that he actually knew and that you have to be able to infer. And the inference was not that Hale's – it wasn't inferences that Hale could make. It was the jury could reasonably infer from the facts of the case. The district court says, you know, the negligence standard is should have known. Correct. And the reasonable person should have known. Right. But the district court says negligence doesn't cut it. Absolutely. And he says that explicitly. He says that twice, I think. And he says that's not enough. Negligence doesn't work. It's called willful blindness for a reason. Right. So the instruction was adequately stated controlling law and wasn't erroneous, much less plainly erroneous. And even if it happened to be, it would be difficult to say that it affected this defendant's substantial rights when the evidence that he did know was overwhelming. I do want to correct a couple of things that Mr. Hale's counsel says in terms of the government's – what the government presented. The government never acknowledged or presented – no witness ever said that Hale didn't know. What the witnesses said was – Bridges, for example, says, I never told him about the boosters. So what we acknowledge through that evidence is we don't have direct evidence. We have loads of circumstantial evidence. But the government didn't get up and say, we don't know. And then in terms – he says that Hale was receiving all kinds of – And Bridges says cleverly, my suppliers were on vacation. They were on vacation. Right. And, you know, he says – Mr. Miller suggests that there was lots of evidence that Hale was engaging in the transportation of legitimate goods, not stolen goods. There's no evidence of that. There's a – he says that there were these two suppliers that were the main suppliers. That's my question. I pointed to him. And, you know, he was arguing that there was a faulty argument made to the jury about the boosters. Right. The fact is the only evidence about these goods came from Bridges, the source of them, and she said they were stolen and they were stolen by boosters who sold them to him. And she even described the groups, the families and the people who came in and who needed it. Right. And so there was – every bit of those goods were stolen goods. That's right. And she was a 90 percent supplier of Hale. That's what I was going to say. Daryl Brock testified that as of 2010, Bridges was 90 percent of the source of Hale's supply. Also, in addition to the fact that it's just sort of part of the offense, the drug-addicted boosters, we also have the testimony from the law enforcement officer that he found out about the whole thing. I mean, the investigation was triggered because a drug investigator, a Gastonia Police Department officer who investigates drug crimes, found that a bunch of his heroin addicts were shoplifting drugs. That's how they were supplying. So he went to Jeremy Williams, who at that time was in the police department in the property crimes, and said, I want to disrupt this chain of money, you know, the route that my addicts are getting to get their drugs. So it was just part of the story of the crime. And the prosecutor did nothing wrong in arguing facts that had been admitted, that were not properly admitted. It couldn't be. It's the nature of the conspiracy. It is part of the conspiracy. It was the core part of the conspiracy. And the issue, only issue, that Hale was trying to present was he could have been a legitimate operation, and he really didn't know that they were stolen. Right. But he doesn't deny his participation in the conspiracy. He denies his knowledge, which, of course, is necessary in the willful blindness issue. And that's his main issue, as I understand it. Oh, absolutely. That was his defense. That was the entirety of his defense. You know, there are lots of secondary markets in all kinds of goods. And people are selling things every day in this country to stores and other places at below retail value. Sure. So there's nothing, you know, intrinsically wrong with a secondary market. I mean, we have all kinds of used goods and this and that, and, you know, maybe lesser quality and everything. And they're being sold below retail value to stores. And it's one of the things that keeps prices down. So it's not, you know, the whole thing doesn't hinge on any intrinsic problem with a secondary or below retail market. The whole thing hinges on the fact that the goods were stolen, and he knew it. Exactly. That's absolutely correct. And, you know, not only... When the investigation starts coming close, he tells Brock to get rid of the goods, get your money out of the bank. Yes. Yes. He takes $200,000 in cash out of his own bank, puts it in his wife, covers up his boat. All of that. All of that. And he also gives him... He advised Brock even before that to record all of the... Because they were talking about going into business together. He advises Brock, get everyone on a recording saying that the goods aren't stolen. And I don't think it should be ignored that this is a gentleman who has been prosecuted for this before. And that prosecution was vacated, or that conviction was vacated by this court, which was appropriate. But I think that he did have... On the willful blindness issue. Exactly. But one could say that if he could plead ignorance then, he certainly could not now. And we had much more evidence. We presented, the government did, much more evidence of his willful blindness in this case. This was not a... There wasn't evidence of a legitimate business. At the end, these instructions are somewhat of a discretionary call on the part of a district judge anyway. They decide based on the quantum of evidence whether the quantum of evidence supports an instruction. And a district judge is entitled to not infinite leeway, but to some leeway. Why are they entitled to some leeway? Because they sat through this thing. Right. And they heard the evidence. We did not. And so they make that judgment call. Yeah. Even if the error was preserved, it would be under an abusive discretion standard of review. It's not preserved, but if it were, this would still be a deferential standard of review. And the district court in this case did not make an error. There was no... If this case doesn't support willful blindness... You've got plain error, you've got harmless error, you've got no error, you've got abusive discretion standard. Yeah. I mean, this is... I respectfully suggest that the government's argument in this case is strong. Because we do have all of those different ways that we can, or this court can, affirm the district court's decision to give the willful blindness instruction as well as the content of that instruction. I think that I have corrected the misstatements, or at least for me, the maybe not entirely fulsome statement about... Or accurate statement. I shouldn't say fulsome. Accurate statement about some of the facts. If this court does not have any other questions on the legal issues, we would request that the court affirm the judgment of the district court. Paul. Yeah. Thank you. Your Honor, if the court please, at 1733, the judge says on willful blindness, the government can prove the defendant knew the goods had been stolen by establishing that deliberately shielded himself from clear evidence of critical facts that were strongly suggested by the circumstances. Willful blindness satisfies the knowledge element if you, the jury, find the evidence supported and inference, not that you find that the evidence supports the fact that the defendant was subjectively aware. The use of the word inference is not consistent with the law. And he subjectively inferred that he's subjectively aware of the high probability that the goods he was buying were stolen, but purposely avoided learning the facts pointing to the facts. That's the clause that comes out of our case, isn't it? The high probability right there of knowledge. That's true. But the high probability that they have to find is not inferred. They have to find as a fact that there's a high probability, not infer that there's a high probability. And they have to find as a fact rather than an inference, the high probability and that the high probability is of the fact itself, not of a fact pointing to the fact. And that is a significant error. Angels are beginning to dance on the head of the pen here because juries draw inferences all the time. But the question, that's not the only question. The question is, what are they drawing an inference about? They're drawing an inference about that there's a high probability that he knew that a certain fact exists and that he took deliberate actions to avoid admitting the fact or learning of the fact or what have you. But that's not what they're told, Judge Wilkerson. That's directly from the Supreme Court's global tech case. But that's not what they're told. They're not told that he then took deliberate action to avoid. They say that he purposely avoided without saying that he took actions, facts pointing to facts. This is not an ordinary instruction. Yes, sir. The jury could find knowledge that Hale deliberately shielded himself from clear evidence of critical facts that were strongly suggested by the circumstances or if he purposely avoided learning the facts pointing to the fact that he was buying stolen goods. So what you have is all kinds of references to purposeful avoidance, deliberate shielding from facts that there was a high probability and strong suggestion that he absolutely knew. The point of instructions and the use of the language in them in this, which is a rare instruction, is to give the jury precise guidance about what they need to do. And as happened in the Walker case, when you get it wrong and you get it right, which is what happened here, because he got it wrong in lines 17 through 22, and he got it right on the next page, 1734. When you get it wrong and you get it right, you don't know what the jury did, and they look to the judge to tell them. And there's another thing the judge did here that is also disconcerting. Let me say one other thing, and that is that Judge Niemeyer's question pointed out we're told not to parse these instructions like a fourth-grade grammar teacher. We're told to look at these instructions as a whole. What does the entirety of the instruction convey? And when Judge Niemeyer read to you the entire sentence, and I've read to you parts of the sentence, and the entire instruction conveys to me negligence doesn't hack it. There's deliberate indifference, deliberately shielding yourself from facts that in their totality suggest a very high probability that you knew, absolutely knew, those goods were stolen. And I might proceed further. The part of the reason I think counsel didn't object to the content of that instruction was not through oversight or ineffectiveness. Counsel didn't object to the instruction because he didn't have a basis to object to the instruction. The instruction as given was correct, and that's why there wasn't an objection. The instruction didn't define subjectively. This is a rare instruction. It's not an ordinary one. And it didn't define subjectively as through his eyes, and that's one of the components, and that was completely left out. Other things that you need to consider, if you would please, is that Cook, who handled all the merchandise, says at 244 and 284 it doesn't look stolen. She says at 214, 19, 244 that 80% had no stickers on it. She handled everything from everybody. The legit guys. 20%. They're coming in the same bags. They're coming from the same woman. They're coming in daily, and 20% of them have stickers from stores, differing stores, which instruct if you're not buying this at this store, call this number. But this is all right there. And then what about all this business about getting rid of the goods and don't turn on me? At the end, when there's an investigation. We only deal in cash. Why don't we deal in cash? Because we don't want to get rid of the records. She destroyed records after three years. They deal in cash because the flea market business is a cash business. He looked at Bonnie Bridges, and she had been in the market business for not five days, 20 years, two decades. The flea market business may be cash, but when Bridges brought it in there, Hale could have given checks. He didn't give checks. He's giving her cash, as she said, when the search took place to go back into the flea market business. And when they looked at her during the search with the wrappers, ah, this is all Steve Hale. No, it's not. I've got lots of customers. So she buys and sells at flea markets. She goes around and looks. Uh-huh. She's where she says she's going to be, doing what she says she's going to do. This is all jury stuff, isn't it? No, this is evidence from the prosecution about her. She admitted she had been in the business 20 years as a government witness. She said she'd never had any trouble during the 20 years, and that she bought and sold at flea markets. Except she testified explicitly, categorically, and clearly that the goods she took to Hale were stolen. She didn't say all of it. She did say all of it. Because some of it she had that she got from flea markets, and some of it she got from the boosters. She was in the business of that until she and Hale, she was doing a small business. Then when she and Hale linked up and Hale created a demand for those goods, selling them to Florida, that's when she started doing this booster business, and she explained it in detail. I don't even think the evidence is questionable. It's almost conclusive. She was still doing flea market business because during the search, the agents kept It was, but that stuff that went to Hale, 90 percent of Hale's business was stolen goods, and that's what she said. She didn't know what percentage of her stuff was his business, and the one person who did know the percentage of his business said most of it didn't come from her. The government said most of it came from the legitimate sources, and that's the government witness who's the only one to handle all of it. So the only person to handle all of it said most of it was from legitimate sources. What did Cook say? That's what Cook said at 244. Thank you, Mr. Miller. Thank you, Your Honor. Good to see you all again.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Barbara Milano Keenan